UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MARCIALENE RADFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21 CV 1368 CDP |
| | ) | |
| LOANCARE, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>

This case concerns a mortgage on a property located at 11159 Zinc Mine Road, Mineral Point, Missouri 63660.  Defendant NewRez, LLC is the holder of the servicing rights on the mortgage; Defendant LoanCare, LLC is a subsidiary of NewRez and the subservicer; and Plaintiff Marcialene Radford is the borrower.[1] Radford alleges that LoanCare violated state and federal law when it claimed and reported that she defaulted on her mortgage when, in fact, she made all her required payments.  She alleges NewRez is vicariously for LoanCare's violations.

Defendants and Radford move for summary judgment.  As explained in detail below, I will grant Radford's motion on liability on her Real Estate

---

[1] None of the parties here were parties to the original mortgage.  Radford's father, Clifford Hubbs, originally took out the mortgage in 2006 and transferred the property to Radford in 2011. (ECF 40-15.)  NewRez acquired the servicing rights on the mortgage in March 2019.  (ECF 64 at p. 2.)

Settlement Procedures Act claims and will and grant Defendants' motion with respect to Radford's Missouri Merchandising Practices Act claims.  I will deny all other aspects of Defendants' motion.

## Background

The parties' dispute stems from one mortgage payment in July 2019.  On July 2, Radford sent a money order for $600 to LoanCare to cover her regular monthly payments for June and July.  Radford received a certified mail receipt showing that LoanCare received the money order and transferred it to Wells Fargo Bank.  (ECF 68-2 at pp. 17, 11.)  However, LoanCare did not credit the payment to Radford's account and thereafter claimed she was two months behind on her loan payments.

Over the following months, Radford and her then husband, Seth Radford, made repeated attempts to advise LoanCare that Radford was current on her payments and to determine why the July payment was not credited to her account.  These attempts included phone calls with LoanCare representatives on July 24 (ECF 45-2 at pp. 10-11), August 5 (*Id.* at p. 11), September 23 (*Id.*), October 30 (*Id.* at p. 11-12), and October 31, 2019 (*Id.* at p. 13), and an email to customer service on August 1, 2019 (ECF 68-2 at p. 24.)  LoanCare did not explain to the Radfords why the payment was not properly credited to Radford's account.

Despite notices that she was behind on her payments in her monthly billing statements, Radford continued to make her monthly payments until December 16, 2019, though several of these payments were late.  (*See* ECF 68-2 at pp. 2-5, 36-41; ECF 45-2 at pp. 15-17, 23, 27.)  In October 2019, LoanCare sent Radford a formal notice of default for failure to pay amounts due.  (ECF 68-2 at p. 27.)  In the notice, LoanCare informed Radford that failure to cure the default within 30 days may result in acceleration of the sums secured by the mortgage, foreclosure, and sale of the Property.  (*Id.*; *See* ECF 40-17.)

On November 9, 2019, Radford sent a letter titled "Request for Information and Notice of Error," to the address listed on LoanCare's monthly statements for such requests.  In the letter, Radford explained that LoanCare failed to credit her July payment, improperly added late charges and penalties to her account, and furnished inaccurate information to Credit Reporting Agencies ("CRAs").  She requested LoanCare update the account to show that all payments had been made, remove all accumulated late charges and fees, update the information it was furnishing to the CRAs, and remove the account from default status.  (ECF 45-1.)  LoanCare did not respond and now claims that it never received the letter.

Radford also sent letters to Equifax, Experian, and TransUnion formally disputing their reports that her mortgage payments were more than 90 days past due and that she was in default.  (ECF 68-2 at p. 32.)  LoanCare received

automated credit dispute verification requests from each of the CRAs, reviewed its records of Radford's payment history, and reported back that the disputed credit reports were accurate.

In June 2020 Radford sued LoanCare in Missouri state court.  In Count 1, she alleged that LoanCare violated Real Estate Settlement Procedures Act by failing to respond to her November 9 Request for Information and Notice of Error. In Count 2, she alleged that LoanCare violated the Federal Credit Report Act by failing to conduct a reasonable investigation into her credit disputes and by verifying inaccurate information to each credit agency.  And in Count 3, she alleged that LoanCare violated the Missouri Merchandising Practices Act by engaging in a variety of deceptive practices in connection with its loan servicing.

After Radford filed her complaint, Defendants' agents began engaging in what Plaintiff characterizes as abusive collection tactics.  Of particular relevance here, LoanCare published a notice of foreclosure sale on the Property in the Washington County Independent-Journal.  (ECF 40-3.)  That foreclosure sale never took place, and no documents were recorded with the Washington County Recorder of Deeds related to the possible foreclosure.

Radford later filed an amended complaint alleging an additional claim against LoanCare for slander of title and four claims seeking to hold NewRez vicariously liable for the violations in Counts 1-4.  NewRez and LoanCare timely

removed to this Court.  They move for summary judgment on each of Radford's claims.  Radford moves for summary judgment on Defendants' liability for her RESPA claims.

## Summary Judgment Standard

In determining whether to grant summary judgment, the court views the facts—and any inferences from those facts—in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant bears the burden of establishing that (1) it is entitled to judgment as a matter of law and (2) there are no genuine issues of material fact.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  Once the movant has met this burden, however, the nonmoving party may not rest on the allegations in its pleadings but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(c)(1), (e).  Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.  *Matsushita*, 475 U.S. at 587.

"[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits."  *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983).  Instead, each summary

judgment motion must be evaluated separately on its own merits to determine

whether a genuine issue of material fact exists and whether the movant is entitled

to judgment as a matter of law. *Husinga v. Federal–Mogul Ignition Co.*, 519 F.

Supp. 2d 929, 942 (S.D. Iowa 2007).

## Discussion

### 1. **Counts 1 and 5: Real Estate Settlement Procedures Act**

The Real Estate Settlement Procedures Act requires mortgage loan servicers

to respond to certain borrower inquiries called "qualified written requests," or

QWRs.  12 U.S.C. § 2605(e).  Within five days of receiving a QWR, the servicer

must provide a written response acknowledging receipt of the correspondence.

§ 2605(e)(1)(A).  And within thirty days of receiving a QWR, the servicer must

take one of three actions:

> (A) make appropriate corrections in the account . . . ;
>
> (B) after conducting an investigation, provide the borrower with a written explanation that includes . . . a statement of the reasons for which the servicer believes the account is correct . . . ; or
>
> (C) after conducting an investigation, provide the borrower with a written explanation that includes . . . the  information requested by the borrower or an explanation of why the information requested is unavailable. . . .

§ 2605(e)(2).  If the servicer fails to comply with these duties, the borrower is

entitled to "any actual damages to the borrower as a result of the failure."

§ 2605(f)(1)(A).

- 6 -

In Counts 1 and 5, Radford alleges that her November 9, 2019, "Request for Information and Notice of Error" was a QWR, and that LoanCare breached its statutory duties by failing to acknowledge receipt of the QWR or otherwise respond.  She moves for summary judgment on Defendants' liability and states that the extent of her damages is an issue remaining for trial.

In support of the motion, Radford filed an affidavit from her ex-husband in which he asserts that he sent the Notice of Error by certified mail to LoanCare's Virginia Beach, Virginia address and that the Notice of Error was signed for by a LoanCare representative on November 15, 2019.  (ECF 45-1.)  Attached to his affidavit are a copy of the Notice of Error letter (*Id.* at pp. 27-28), the documents included in the letter showing that LoanCare received and deposited Radford's July 2019 payment (*Id.* at pp. 16-22), and a certified mail receipt showing that the Notice of Error letter was delivered to LoanCare's address and signed for by "W. Champion" on November 15.  (*Id.* at pp. 29-31.)  Radford asserts that W. Champion is LoanCare's mailroom supervisor.

Defendants also move for summary judgment on Counts 1 and 5.  First, they claim that LoanCare has "scoured their records and have never identified receipt of any correspondence from [Radford] in November 2019."  (ECF 43 at pp. 19-20.) Defendants argue that because LoanCare never received a QWR from Radford, its duties under RESPA were never triggered.  Second, they argue that, even if

LoanCare did receive the letter, the letter does not meet the statutory definition of a QWR because it failed to provide sufficient information for LoanCare to investigate or respond to the request.  Third, they argue that even if LoanCare breached its statutory duties, Radford has failed to show that those breaches caused actual damages.

   a.  *LoanCare received the November 9 Letter.*

   "The law presumes that a letter properly addressed, stamped, and mailed was received by the person to whom it was addressed." *Starr ex rel. Cotton v. Metro Sys., Inc.*, No. CIV.01-1122 JNE/JGL, 2004 WL 1798362, at *3 (D. Minn. Aug. 10, 2004) (citing *Hagner v. United States*, 285 U.S. 427, 431 (1932)).

   Defendants attempt to rebut this presumption with testimony from LoanCare's corporate representative that LoanCare has no record of Radford's letter and that it has a policy of acknowledging receipt of QWRs within five business days.  (ECF 40-4 at pp. 1-2; ECF 40-5 at dep. p. 63:11-16.)  This is insufficient.  Other courts have found that evidence of standardized procedures used in processing claims combined with direct testimony of nonreceipt may be sufficient to support a finding that a mailing was not received.  *See Kin Chun Chung v. JPMorgan Chase Bank, N.A.*, 975 F.Supp.2d 1333, 1348 (N.D. Ga. 2013).  But LoanCare relies only on the testimony of its corporate representative.

It offers no evidence of any standardized procedures for documenting such correspondence.

With notable audacity, Defendants argue that Radford "provided no evidence contradicting" their claim that LoanCare never received the letter (ECF 83 at p. 18), that she "alleged completely disconnected facts" (*Id.*), and that her "non-sequiter responses do nothing to contradict" LoanCare's policies and the lacuna in its records.  (*Id.* at p. 19.)  On the contrary, Radford's exhibits showing a copy of the letter, certified mail receipts, tracking history, and delivery confirmation are more than sufficient for a reasonable juror to conclude that LoanCare in fact received the letter.  If an absence of records of correspondence and a general policy of responding to QWRs were sufficient to defeat this evidence, RESPA's requirements would be quite toothless.  No genuine dispute exists on this issue: Radford sent and LoanCare received the November 9 Letter.

b. *The November 9 Letter Constitutes a QWR.*

Radford's letter also qualifies as a QWR.  RESPA defines a QWR as a

written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that—

(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

(ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

§ 2605(e)(1)(B).

Defendants admit that the letter contains the information in subsection (i)—Radford's name and account number—but they argue that Radford failed to sufficiently identify the error she believed occurred.  They argue that the letter they claim not to have received did not include the attachments identified in Radford's husband's affidavit.  They then assert that because the letter "confusingly made reference to these non-existent documents and did not provide basic information . . . there was effectively no information regarding the basics of the alleged error[.]"  (ECF 65 at p. 11.)

Defendants' arguments are again insufficient.  Even if no documents were attached to Radford's letter, the information in the letter alone is sufficient to qualify as a QWR.  The letter quite specifically states the error Radford believed to have occurred.  She wrote:

> My husband and I have sent multiple written and electronic messages to your representatives which clearly show that a United States Postal Service ("USPS") money order in the amount of $600.00 was sent to your payment address on July 2, 2019 . . . .  There is no doubt that this double payment was sent by me, received by LoanCare and cashed by LoanCare, yet has been refused to credit these payments to my account.  The result is that LoanCare is improperly and illegally adding late charges and penalties to my account, and inaccurately furnishing information to the Credit Reporting Agencies showing that I am two payments behind on my mortgage and this information is showing up on my credit report.  Finally, I recently received the attached letter dated October 29, 2019 from LoanCare declaring that I am in default on the account and threatening me with foreclosure.

(ECF 68-2 at pp. 7-8.)  This is not an " 'overbroad' and generalized statement of

'bad servicing.' " (ECF 65 at p. 11 (quoting 12 C.F.R. § 1024.35(g)).)  It identifies

an error specifically contemplated by RESPA's regulations.  *See* 12 C.F.R.

§ 1024.35(b) ("[T]he term 'error' refers to the following categories of covered

errors: . . . (2) Failure to apply an accepted payment to principal, interest, escrow,

or other charges under the terms of the mortgage loan and applicable law.")

 Defendants argue that asking LoanCare to find the disputed payment is like

asking it to "find a specific needle in a pile of needles." (ECF 83 at p. 20.)  But

LoanCare needed only to investigate the dispute and explain why the information

requested was unavailable or why it believed the account information was correct.

And the regulations allow a servicer to request additional information when

responding to a QWR.  12 C.F.R. § 1024.35(e)(2).  The letter discusses Radford's

repeated complaints with LoanCare regarding the asserted error.  These

communications are reflected in LoanCare's loan notes—LoanCare even submitted

a transcript of a phone call in which Radford's ex-husband provided LoanCare the

money order number for the July payment, its tracking number, and the date it was

cashed.  (ECF 64-7 at pp. 7-8.)

 Again, Defendants have not presented evidence to create a genuine dispute

on this issue.  Radford's letter constituted a QWR under RESPA.

*c.  Radford's Evidence of Damages is Sufficient to Withstand Summary Judgment.*

Not all violations of RESPA are actionable.  A plaintiff may only recover for violations that cause actual damages and, "in the case of a pattern or practice of noncompliance," $2,000 in statutory damages. 12 U.S.C. § 2605(f)(1). Thus, proof of actual damages is an essential element of a RESPA claim.  *Wirtz v. Specialized Loan Servicing, LLC*, 886 F.3d 713, 718 (8th Cir. 2018).

Defendants argue that the undisputed material facts show that Radford was not damaged by LoanCare's RESPA violation.  They claim that testimony from Radford's treating psychiatric nurse practitioner, Janet Murdick, shows that it is impossible to determine which of the various issues in Radford's life caused her anxiety, stress, or depression at a particular time.  Specifically, when asked how it is possible to determine which of those issues caused Radford's distress, Murdick responded, "I don't know that you can . . . . You are correct in assuming that they are all stressors and there's no way of knowing which one is producing the most stress for her."  (ECF 40-12 at dep. p. 95:2-7.)

RESPA does not require that a lender's violations be the sole cause of a borrower's emotional distress.  It merely requires that damages be causally related to a violation of the statute.  And Murdick's deposition testimony is more than

sufficient for a jury to conclude that LoanCare's failure to respond to Radford's QWR caused her emotional damages.[2]

Murdick clarified that Radford's problems with her house "impacted her greatly" (ECF 68-5 at deposition p. 167:2), played a major role in her stressors (*Id.* at dep. p. 166:20), and was the precipitating trigger for her PTSD.  (*Id.* at dep. pp. 166:2-10; 171:17-18.)  After discussing a 2015 study finding that 91% of studies on the relationship between a foreclosure and health outcomes concluded that foreclosure had adverse effects on an individual, Murdick testified that Radford "was very disturbed by this. . . . She wants this home.  Her father built it.  It's very meaningful to her.  It takes her all the way back to childhood and any threat to this is going to impact her greatly."  (*Id.* at dep. p. 168:20-169:15)  Murdick also testified that the other sources of Radford's mental suffering were related to the threatened foreclosure.  (*Id.* at dep. p. 171:17-21 ("I think [the situation with her house] was the precipitating trigger.  And then—as I say, it impacts everything else and so then they all became triggers, her relationship, her work, but I think they were all affected by that.").)  Radford has presented sufficient evidence for a jury to find that LoanCare's RESPA violation resulted in actual damages.

---

[2] While the Eighth Circuit has not directly addressed whether emotional damages are recoverable under RESPA, several other courts have allowed the recovery of such damages.  *See, e.g., Ranger v. Wells Fargo Bank N.A.*, 757 F. App'x 896, 902 (11th Cir. 2018); *Perron on behalf of Jackson v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 858 (7th Cir. 2017); *Houston v. U.S. Bank Home Mortg. Wisconsin Servicing*, 505 F. App'x 543, 548 (6th Cir. 2012).

Defendants' motion for summary judgment on Counts 1 and 5 must be denied. Radford is entitled to summary judgment on liability but must still prove at trial damages caused by LoanCare's violation.

## 2. Counts 2 and 6: Fair Credit Reporting Act

The Fair Credit Reporting Act imposes civil liability on individuals who willfully or negligently fail to comply with the Act's requirements. 15 U.S.C. § 1681s-2. Section 1681s-2(a) requires furnishers of information to provide accurate information to credit reporting agencies. And Section 1681s-2(b) requires them to investigate the accuracy of reported information after receiving notice of a dispute from a CRA. Specifically, they must

> (A) conduct an investigation with respect to the disputed information;

> (B) review all relevant information provided by the [CRA] pursuant to section 1681i(a)(2) of this title;

> (C) report the results of the investigation to the [CRA];

> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other [CRAs] to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

> (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a [CRA] only, as appropriate, based on the results of the reinvestigation promptly--

>> (i) modify that item of information;

>> (ii) delete that item of information; or

- 14 -

(iii) permanently block the reporting of that item of information. 15 U.S.C. § 1681s-2(b).  If a furnisher negligently fails to comply with these duties, a consumer may sue for actual damages caused by the furnisher's failure. § 1681o.  If the furnisher willfully fails to comply, the consumer may recover punitive damages. § 1681n.

In Counts 2 and 6, Radford claims that LoanCare negligently and willfully violated §1681s-2 by failing to conduct a reasonable investigation into her credit disputes and verifying inaccurate information to the CRAs.  Defendants argue that Radford's claims fail for two reasons: (1) LoanCare investigated Radford's payment history in response to the CRAs' automated credit dispute verification ("ACDV") requests and determined that the CRAs' reports were accurate, and (2) Radford has not shown she suffered damages as a result of the alleged violation.

Though the FCRA does not define the level of investigation required under § 1681s-2(b)(1), the investigation must be reasonable.  *See, e.g.*, *Cramer v. Equifax Info. Servs., LLC*, No. 4:18-CV-1078 CAS, 2019 WL 5188942, at *7 (E.D. Mo. Oct. 15, 2019).  What qualifies as a reasonable investigation will depend on the records available and, "most importantly[,] the CRA's description of the dispute in the notice." *Williams v. USAA Sav. Bank*, No. 4:21-00579-CV-RK, 2022 WL 16951665, at *5 (W.D. Mo. Nov. 15, 2022) (quoting *Meyer v. FIA Card Servs., N.A.*, 780 F. Supp. 2d 879, 883 (D. Minn. 2011)).  This issue is normally a factual

question reserved for trial. "[S]ummary judgment is proper if the reasonableness of the defendant's procedures is beyond question." *Cramer v. Equifax Info. Servs., LLC*, No. 4:18-CV-1078 CAS, 2019 WL 5188942, *7 (E.D. Mo. Oct. 15, 2019). (quoting *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005)).

LoanCare's investigations of the ACDV requests consisted of reviewing Radford's account records and determining whether payments had been applied to her account. Defendants argue Radford cannot show this investigation was unreasonable because LoanCare needed only to investigate what was contained in the CRAs' ACDV requests, and Radford acknowledged she "does not know what was sent from the [CRAs] to Defendants." (ECF 83 at p. 14.)

This court has previously called this line of argument disingenuous. *See Cathcart v. Am. Exp. Co.*, No. 4:11-CV-2125-JAR, 2014 WL 5320236, at *7 (E.D. Mo. Oct. 17, 2014). That is especially true here. The ACDV requests were sent directly to LoanCare—it is certainly aware of their contents. Moreover, Defendants lambast Radford for failing to "grace[] the Court or Defendants with any identification" of what she sent to the CRAs, (ECF 83 at p. 12), but then fail to provide any evidence of these ACDV requests.

Radford's dispute letters sent to TransUnion, Experian, and Equifax assert that each CRA erroneously listed her home loan account as ninety days past due and that documents attached to the letter show that she made her payments from

- 16 -

April 2019 to November 2019.  (ECF 40-8.)  Radford's ex-husband provided an

affidavit in which he asserts that he mailed the letters with evidence of Radford's

payments.   (ECF 68-2 at pp. 4-5.)  A reasonable jury could infer that the CRAs

forwarded this information to LoanCare because a CRA's notice of dispute to a

furnisher of information must "include all relevant information regarding the

dispute that the agency has received from the consumer or reseller." [3]  15 U.S.C.

§ 1681i(2)(A).  It could further conclude that LoanCare's failure to review this

information was unreasonable.

The reasonableness of LoanCare's investigation is genuinely disputed.  At

the time LoanCare received the ACDV requests in December 2019, the loan notes

on Radford's account reflected repeated disputes in the preceding months

regarding her June and July payments, but LoanCare does not even claim that it

reviewed these complaints during its investigation.  While "a furnisher of

information need investigate only what is contained in the CRA's dispute notice as

to the nature of the dispute," *Edeh v. Midland Credit Mgmt., Inc.*, 413 F. App'x

925, 926 (8th Cir. 2011), it must actually *investigate*.  That is, the furnisher must

conduct "some degree of careful inquiry[.]"  *Meyer*, 780 F. Supp. 2d at 833.  In

---

[3] Despite Defendants' insistence that "the documents produced by Radford do not indicate that anything was attached to the" CRA letters, (ECF 40 at p. 3), Defendants do not specifically deny that Radford sent the documents to the CRAs or that the CRAs failed to comply with its obligation to include those documents in its dispute notice.  (*See* ECF 45-2 at p. 24.)

light of the information provided in Radford's letter, a reasonable jury could

conclude that the failure to examine Radford's repeated disputes and

communications fell short of this standard.

Defendants' second argument does not entitle them to summary judgment

either. As an initial matter, Radford alleges both negligent and willful violations of

the FCRA. While a claim for negligent violation requires proof of actual damages

resulting from the violation, "a plaintiff can recover statutory and punitive

damages after a willful violation even if the plaintiff did not suffer any actual

damages as a result of the violation." *Sherman v. Sheffield Fin.*, LLC, No. CV 20-

1764 (JRT/LIB), 2022 WL 4233775, at *13 (D. Minn. Sept. 14, 2022) (citing

*Bakker v. McKinnon*, 152 F.3d 1007, 1013 (8th Cir. 1998) ("Actual damages are

not a statutory prerequisite to an award of punitive damages under the [FCRA].")).

In any event, Radford has provided evidence of actual damages resulting

from LoanCare's FCRA violation. Actual damages under the FCRA may include

emotional distress damages and denials of credit or higher interest rates. *Sherman*

*v. Sheffield Fin., LLC*, No. CV 20-1764 (JRT/LIB), 2022 WL 4233775, at *11 (D.

Minn. Sept. 14, 2022). Radford has provided some evidence of emotional distress

and evidence that LoanCare's failure to correct the inaccurate information it

furnished to the CRAs caused her denials of credit. Radford's affidavit asserts that

her attempts to co-sign on her son's applications for car loans in July and October

2022 were rejected after the car dealerships made credit inquiries with Equifax and Experian.  When considered in conjunction with the evidence already discussed, this evidence is sufficient to present a genuine factual dispute regarding Radford's actual damages from LoanCare's FCRA violation.

I will accordingly deny Defendants' motion for summary judgment on Counts 2 and 6.

### 3.  Counts 3 and 7: Missouri Merchandising Practices Act

Radford next alleges that Defendants violated the Missouri Merchandising Practices Act.[4]  The MMPA prohibits a variety of deceptive practices in connection with the sale or advertisement of merchandise and authorizes purchasers to sue for damages caused by such unlawful practices.  *See* Mo. Rev. Stat. § 407.020.1.  However, these prohibitions do not apply to

> [a]ny institution, company, or entity that is subject to chartering, licensing, or regulation by the . . . director of the division of finance under chapters 361 to 369, or chapter 371, unless such director[] specifically authorize[s] the attorney general to implement the powers of this chapter or such powers are provided to either the attorney general or a private citizen by statute[.]

Mo. Rev. Stat. § 407.020.2(2).

---

[4] Radford claims they did so by: "a. Failing to properly credit Plaintiffs' monthly payments and update it[s] accounting records; b. Declaring that Plaintiff was in default on her account when she was not in default; c. Adding late fees, penalties and other default charges to [P]laintiff's account and balance due when she was not in default; d. Ignoring and/or willfully disregarding all of the evidence and documentation provided by Plaintiff demonstrating that she had made all of the required payments on the account and was not default; e. Placing Plaintiff's account into foreclosure without any legal justification."  (ECF 1-2 at p. 12.)

Defendants assert that they are exempt because they are licensed by the director of the division of finance. They provided a screenshot from the Missouri Division of Finance's website showing their license/charter numbers, original license dates, and licensee details. (ECF 40-13; ECF 40-14.)

State and federal courts have concluded that section 407.020.1 does not apply to entities subject to licensing by the director of the division of finance. *See, e.g.*, *Reitz v. Nationstar Mortg.*, LLC, 954 F.Supp.2d 870, 892-93 (E.D. Mo. 2013); *Memhardt v. Nationstar Mortg., LLC*, No. 4:17-CV-01411-AGF, 2018 WL 5923445, at *7 (E.D. Mo. Nov. 13, 2018); *Meyers v. Kendrick*, 529 S.W.3d 54, 62 (Mo. Ct. App. 2017).

Radford provides no persuasive reason to depart from this consensus. She cites dicta from the Missouri Court of Appeals expressing skepticism that § 407.020.2 created a "vast immunity" for licensees from "all MMPA liability[.]" *Heinz v. Driven Auto Sales, LLC*, 603 S.W.3d 890, 899 (Mo. Ct. App. 2020). But that case dealt with unique circumstances absent here, and the Missouri Court of Appeals did not purport to cast doubt on section 407.020.2's validity. [5]

---

[5] In that case, the seller of an automobile also financed a loan for the purchaser, and then failed to deliver title. The Court held that the credit union to whom the dealer assigned its rights under both the sales contract and the finance contract could be sued under the MMPA because of its status as an assignee of the dealer. *Heinz*, 603 S.W.3d at 897.

Radford also argues that Defendants waived this defense because they failed to raise it in their answers to her amended complaint.  As a general rule, failure to plead an affirmative defense results in the waiver of that defense.  Fed. R. Civ. P. 8(c).  But the Eighth Circuit has allowed assertions of unpleaded affirmative defenses when they do not result in unfair surprise, including at the summary judgment stage.  *See Camarillo v. McCarrthy*, 998 F.2d 638, 639 (9th Cir. 1993) (affirmative defense may be raised for first time in summary judgment motion in absence of prejudice) (cited approvingly by *Stoebner v. Parry, Murray, Ward & Moxley*, 91 F.3d 1091, 1093 (8th Cir. 1996)).  Radford does not argue that LoanCare's assertion resulted in unfair surprise, or otherwise argue that LoanCare's defense is defective in some way, so the purpose of Rule 8(c) would not be furthered by dismissing LoanCare's defense as waived.

I will accordingly grant summary judgment for Defendants on the MMPA claim in Counts 3 and 7.

### 4.  Counts 4 and 8: Slander of Title

In Radford's final causes of action against Defendants, she claims that LoanCare slandered her title to the Property by publishing its notice of foreclosure sale.  She must prove four elements to prevail on her claim: "(1) an interest in the property, (2) that the words published were false, (3) 'that the words were maliciously published,' and (4) that [she] 'suffered pecuniary loss' 'as a result of

the false statement.' " *Erickson v. Nationstar Mortg.*, 31 F.4th 1044, 1048 (8th Cir. 2022) (quoting *Bechtle v. Adbar Co., L.C.*, 14 S.W.3d 725, 728 (Mo. Ct. App. 2000)); *see also Tongay v. Franklin Cnty. Mercantile Bank*, 735 S.W.2d 766, 770 (Mo. Ct. App. 1987).

Defendants argue that Radford cannot prove the second and third elements: that LoanCare published false words and that the words were maliciously published. They claim that a recorded instrument is necessary to constitute publication in slander of title claims. And they note that the notice of foreclosure sale did not name Radford—it only mentioned Clifford Hubbs. They argue Radford cannot show that the notice of foreclosure sale was maliciously published because any error was innocently made.

Defendants' arguments do not entitle them to summary judgment. A recorded instrument is not necessary for a slander of title claim. *May v. Nationstar Mortg.*, LLC, No. 4:14CV0578 TCM, 2014 WL 6607191, at *13 (E.D. Mo. Nov. 19, 2014) ("While the recording of a false instrument states a claim under slander of title, other circumstances also support such a claim.") (cleaned up). And a publication need not mention the plaintiff by name. Rather, "it must be shown that the reader reasonably understood the defamatory words to have been directed to the plaintiff." *May v. Greater Kansas City Dental Soc.*, 863 S.W.2d 941, 945 (Mo. Ct. App. 1993). Here, the notice of foreclosure sale's identification of the property

is sufficient to show that a reader would understand the publication to refer to

Radford's title to the property.  (ECF 40-3.)

There is also sufficient evidence that Defendants published the notice with

malice.  To establish malice,

> the evidence of plaintiffs must support a reasonable inference that the representation not only was without legal justification or excuse, but was not innocently or ignorantly made.  Such inference may rest on a foundation of circumstantial evidence and proof of a lack of probable cause . . . .  Where there is sufficient evidence or where there may be a fair difference of opinion on the issue of malice, the question whether the defendant in an action for slander of title was actuated by malice is one of fact for the jury.

*Tongay*, 735 S.W.2d at 770.  Because Radford repeatedly showed LoanCare that

she was not in default on the property,  a jury could reasonably conclude that

LoanCare knew that Radford was not in default when it published the notice of

foreclosure sale.

I will therefore deny Defendants' motion for summary judgment on Counts

4 and 8.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary

Judgment [39] is **GRANTED** to the extent Defendants seek judgment as a matter

of law on Counts 3 and 7 for violations of the Missouri Merchandising Practices

Act and is **DENIED** in all other respects.

- 23 -

**IT IS FURTHER ORDERED** Plaintiff Marcialene Radford's Motion for Partial Summary Judgment [44] is **GRANTED** to the extent Radford seeks judgment as a matter of law on Defendants' liability on Counts 1 and 5 for violations of the Real Estate Settlement Procedures Act, but all damages issues remain for trial.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of May 2023.